# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ALONZO PINA,<br><br>                    Petitioner,<br><br>     v.<br><br>MATTHEW CATE, Secretary,<br><br>                    Respondent. | Civil No.     09-1729 L (POR)<br><br>**REPORT AND RECOMMENDATION THAT PETITION FOR HABEAS CORPUS BE DENIED**<br><br>**[Document No. 1]** |

## I. Introduction

Petitioner Jose Alonzo Pina, a state prisoner proceeding *pro se*, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in San Diego Superior Court. (Doc 1.) Petitioner claims he is entitled to habeas relief because (1) the evidence was insufficient to convict him of second-degree murder (Ground Two), and (2) because the trial judge improperly instructed the jury on (i) aiding and abetting (Ground One), (ii) reasonable doubt (Ground Three) , and (iii) evaluating circumstantial evidence (Ground Four). (Id.)

Respondent filed an Answer, requesting the Court deny the Petition. (Doc. 11.) Respondent contends the Court should deny the Petition because the California Court of Appeal rejected Petitioner's claims, and the appellate court's decisions were consistent with federal law and reasonable in light of the evidence. (Doc. 11 at 1.)

//

//

After a thorough review of the Petition, Answer, Traverse, and all supporting documents, the Court finds Petitioner is not entitled to the relief requested. Accordingly, the Court RECOMMENDS the Petition for Writ of Habeas Corpus be **DENIED**.

## II. BACKGROUND

**A.    Factual Background**

The following facts are taken from the California Court of Appeal's opinion in People v. Pina, 2008 WL 755067, *1-3 (Cal. App. March 20, 2008). (Lodgment 6 at 2-6.) The Court presumes these factual determinations are correct pursuant to 28 U.S.C.A. § 2254(e)(1).

> In 2003 Jose Cardona, Sr., and his 17-year-old son Jose Cardona, Jr. (Jose), moved in with Cardona's girlfriend Guadalupe Diane Pina (Diane). Appellant (Jose Pina) lived with his mother Diane at her house in the Logan Heights section of San Diego with his two sisters and a brother. Diane's two older children, Alicia and Alfredo, lived elsewhere.
>
> Cardona and Diane often had loud but not physically violent arguments about money. Eventually, Cardona and Jose moved into a trailer in Diane's backyard but continued to eat and shower in the house. Diane and Cardona continued to argue about money.
>
> In the late morning of December 21, 2004, Jose left the trailer to go to the house. As he walked up the backstairs, he and appellant [Pina] bumped shoulders. Jose apologized. Appellant asked Jose why he was being disrespectful. Appellant, looking angry, asked Jose what he wanted to do. Jose responded with the same threatening question.
>
> Cardona came out of the house and asked why appellant was trying to fight Jose. Cardona asked appellant if he wanted to fight him. Appellant and Cardona argued. Appellant told Cardona to "pack his stuff." Cardona replied he would pack his stuff when he wanted to. As the two yelled at each other, appellant stated he was going to call his brother Alfredo.[1]
>
> Diane came out of the house and began yelling at Cardona, telling him he was not wanted there and for him to get his stuff and leave. After five or ten minutes, the yelling subsided. Diane and appellant, however, continued telling Cardona to get out. Cardona told Jose they would leave. At some point, Diane said" "Oh, you're gonna leave one way or another."
>
> After a few minutes, a vehicle pulled up and Alfredo came out the back door of the house. He first talked with Diane and appellant. With Alfredo's arrival, the yelling started again. Alfredo told Cardona to get his stuff and get out. Cardona replied he would get his stuff when he wanted to. When it was clear Cardona was not leaving, Alfredo said: "All right, then. All right." Alfredo left the house, saying he would be back.
>
> Cardona and Jose walked to the trailer. Cardona told Jose to go to a friend's house until things calmed down. As Jose was leaving, appellant told him not to be surprised if he saw

---

[1] In his Traverse, Petitioner asserts this statement is false. Petitioner contends at trial, Jose testified he did not see Petitioner "make any phone calls and that to his knowledge, there were no phones in [the] Pina home." (Doc. 19 at 4.)

-2-

his father on the 8 o'clock news.[2] As Jose left the house through the back gate, he saw Alfredo get into a blue van he knew belonged to the mother of Alfredo's girlfriend. Alfredo drove away quickly.

After Jose left, Cardona went to the home of a next-door neighbor, Joseph Leakes. Leakes heard the yelling at Diane's house. Cardona told Leakes that one of Diane's sons was going to get his "buddies."

Cardona then went to the home of another neighbor, Annie Ridgell. Cardona arrived around noon. He told Ridgell he had an argument with Diane and her sons and that they were giving him a bad time.

At approximately 1:45 p.m., Alma Eleuterio, who lived across the alley from the rear of Diane's house, heard four gunshots. She then heard someone say, "You fucked me up," and then heard someone respond, "That is what you wanted."

Leakes also heard shots. When he went to the fence to investigate, he saw Cardona on the ground in the alley moaning. Leakes called the police and stayed with Cardona until help arrived. Through the gate to the Pinas' backyard Leakes could see Jose Palacios, a friend of appellant, sitting on Cardona's trailer.

On the afternoon of December 21, 2004, Jose Martinez was working on his truck several houses down the alley from Diane's house. Martinez saw a blue van drive up the alley. Some time later he heard a loud popping sound. Four or five houses down the alley he saw a man standing near the blue van. The man was pointing a shotgun at another man. The van was parked immediately behind Diane's rear yard with its passenger side facing a gate leading from the yard to the alley. The man pumped the gun to reload it. Martinez looked away to tell his younger brother to get in the garage. As he did so, he heard a second shot. When he looked back, he saw a man on the ground. The shooter straddled him, pumped the gun again and fired a third shot at the man.

The shooter then went to the driver's side of the van. The man on the ground tried to get up and move to a gate to one of the houses. As he did so, a second assailant came from the passenger side of the van and punched and kicked Cardona in the face, head and upper body. The shooter called to the second assailant to get in the van. He did so and the van drove off.

Martinez was unable to positively identify the assailants but was able to describe the shooter as a Mexican man about five feet, eight inches to five feet, ten inches tall, 180 to 200 pounds in weight with a stocky build, bald or with very short hair, "rough shaven," and wearing black pants and a brown flannel shirt. The second assailant was also a Mexican man, again five feet, eight inches to five feet, ten inches tall but lighter in weight, 160 to 180 pounds, clean shaven, with short hair, wearing a white shirt and dark pants with lighter skin and hair a little longer than the shooter's.

When shown a picture of appellant taken at the time of his arrest in March 2005, Martinez stated appellant looked similar to the second assailant with regard to his facial characteristics, skin color, height, and weight.

Cardona died at the scene from three shotgun wounds, one to the torso, one to the abdomen, and one to the left leg. He also suffered two stab wounds to the back of the head. He had abrasions on his face, abdomen and leg consistent with being struck by a hard object or from falling to the ground.

---

[2] In his Traverse, Petitioner asserts this statement is false. Petitioner contends at trial, Jose testified he could not remember who made the comment referring to the 8 o'clock news. (Doc. 19 at 4.)

About 9:30 p.m. on the evening of Cardona's death, officers went to Alfredo's apartment and found a van fitting the description of the one used in the crime. The van was owned by the mother of Alfredo's girlfriend and Alfredo occasionally used it.

The day after the murder, persons at Alfredo's workplace were interviewed. They stated that around 12:45 p.m. the day of the crime Alfredo received a call at work. He told his supervisor he had to leave to take care of business but would return. Alfredo was gone about an hour, returning around 2:00 p.m.

Handwritten entries, however, on Alfredo's time card represented he was working from 12:59 p.m. to 1:45 p.m. and took a break from 1:30 to 1:45 p.m. Alfredo's supervisor, who was familiar with Alfredo's handwriting, testified the handwriting on the time card appeared to be Alfredo's. Generally, Alfredo punched in and out using a time clock.

**B.  Procedural Background**

On April 24, 2006, a jury convicted Petitioner of second-degree murder. (Lodgment 6 at 1.) The court sentenced Petitioner to a prison term of 36 years to life. (Id.) Petitioner appealed to the California Court of Appeal, alleging: (1) the evidence was insufficient to support his second-degree murder conviction; (2) the trial court erred when it instructed the jury on aiding and abetting, the evaluation of circumstantial evidence, and reasonable doubt; and (3) cumulative error. (Lodgment. 6 at 1-2.) On March 20, 2008, the California Court of Appeal affirmed the conviction. (Lodgment. 6 at 1.) Petitioner then appealed to the California Supreme Court on the same grounds by filing a petition for review. (Lodgment 7.) On July 9, 2008, his petition was denied without comment. (Lodgment 8.)

On August 7, 2009, Petitioner filed the instant Petition for Writ of Habeas Corpus in federal court. (Doc. 1.) On November 11, 2009, Respondent filed an Answer, requesting the Court deny the Petitioner. (Doc. 11.) On January 26, 2010, Petitioner filed a Traverse. (Doc. 19.)

**III. STANDARD OF REVIEW**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). As amended, the AEDPA now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the application of the claim–

-4-

> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (emphasis added).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). With regard to § 2254(d)(1), the threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final. Id. at 406. Clearly established federal law, as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 71 (2003). However, Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000). Only after the clearly established federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly established federal law. See Lockyer, 538 U.S. at 71-72.

A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams, 529 U.S. at 405-06. "A state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. Under Williams, an application of federal law is unreasonable only if it is "objectively unreasonable." Id. at 409.

Further, with regard to § 2254(d)(2), a state court's decision results in a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding" if it "is so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted).

## IV. DISCUSSION

The instant Petition raises four grounds for relief: (1) the trial court misinstructed the jury when it instructed that an aider and abettor need not be present at the crime (Doc. 1 at 4, 8-11 ); (2) the evidence was insufficient to sustain Petitioner's conviction (Doc. 1 at 4, 12-14); (3) the trial court misinstructed the jury on the definition of reasonable doubt (Doc. 1 at 5, 15-18); and (4) the trial court's modification of CALCRIM No. 225 misled the jury on the evaluation of circumstantial evidence (Doc. 1 at 5, 19-21.)[3]

Respondent contends the Court should deny the Petition because the California Court of Appeal's rejection of each of Petitioner's claims was consistent with federal law and based on a reasonable interpretation of the facts. (Doc. 11 at 9.)

In his Traverse, Petitioner contends the state court's conclusions were unreasonable and inconsistent with federal constitutional law. (Doc. 19.)

**A.      Ground Two: Insufficiency of the Evidence**

In Ground Two, Petitioner contends the evidence was insufficient to support his conviction for second degree murder. (Doc. 1 at 6.) Specifically, Petitioner contends there was "no physical evidence, no weapons were recovered, no finger prints [sic], no DNA, and no positive identification by the sole eye witness to tie Petitioner to the crime." (Id.) Furthermore, Petitioner contends, "the circumstantial evidence was so weak that it raised no more than a mere suspicion of his involvement." (Id.)

Respondent contends the California Court of Appeal reasonably determined the facts and applied the relevant law in concluding the evidence was sufficient to support Petitioner's conviction for murder. (Doc. 11 at 19-21.)

---

[3] For the sake of clarity, this Court will address the sufficiency of evidence ground first, and then the three jury instruction grounds.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available only if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979). Under Jackson, this standard must be applied with reference to the substantive elements of the criminal offense as defined by state law. Id. at 324 n.16. Further, circumstantial evidence is sufficient to support a conviction and prove specific intent, and the reviewing court is required to uphold the conviction even if "[i]nferences to the contrary would also be rational." Payne v. Borg, 982 F.2d 335, 341 (9th Cir. 1992).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). As there was no reasoned decision from the California Supreme Court, the Court "looks through" to the decision of the California Court of Appeal, which held the evidence was sufficient to convict Petitioner of second degree murder. (Lodgment 6 at 7-9.)

In the last reasoned state court decision, the California Court of Appeal held that, in viewing the record in a light favorable to the judgment, a reasonable trier of fact could find the elements of second degree murder beyond a reasonable doubt. People v. Carter, 36 Cal.4th 1114, 1156 (2005).[4] First, the appellate court found the evidence that Petitioner's brother was the shooter was extremely strong. (Lodgment 6 at 7.) Second, the appellate court noted the evidence was sufficient to prove Petitioner aided and abetted the murder. (Id.) Specifically, the court discussed the following: (1) Petitioner, his mother, and his brother had a heated argument with the victim the day of the murder; (2) Petitioner was an active participant in the argument the day of the murder, telling the victim's son to not be surprised if he saw his father on the 8 o'clock news; (3) although an eye-witness could not identify Petitioner as the second assailant, the eye-witness stated Petitioner looked similar to the second assailant involved in the murder; (4) the jury could reasonably conclude that the "coup de grace nature" of the stabbing and kicking was the anger driven reaction of Petitioner; and (5) because the second assailant did not appear until after the shooting, the jury could conclude the second man was Petitioner, who hearing the shots in the alley, walked through the gate from his

---

[4] The California Court of Appeal applied a legal standard equivalent to the constitutional standard enunciated in Jackson v. Virginia, 443 U.S. at 324.

1  mother's backyard around the front of the van and assaulted the victim.  (Id. at 7-9.)  Accordingly,
2  the Court of Appeal held the evidence was sufficient to convict Petitioner of second degree murder.
3  (Id. at 9.)

4  The Court of Appeal's application of Jackson[5] was neither an unreasonable application of
5  federal law nor an unreasonable determination of the facts.  As required by Jackson, in reviewing the
6  record in a light most favorable to the prosecution, a rational trier of fact could have found proof of
7  Petitioner's guilt beyond a reasonable doubt.  Jackson, 443 U.S. at 324.  At trial, the prosecution
8  presented circumstantial evidence to prove Petitioner was guilty of second degree murder.  Jose
9  Cardona, Jr., the victim's son, testified that the dispute on the day of the crime began with bumping
10 between himself and Petitioner.  (Lodgment 2, Vol. 6 at 828-836.)  Jose Cardona, Jr., testified that
11 Petitioner became angry and wanted to fight, first with him, and then with the victim.  (Id.)
12 Detective Kenneth William Brown further testified that just before the shooting, Petitioner told Jose,
13 Jr. something to the effect of "Don't be surprised if your dad is on the 8 o'clock news."  (RT 1513-
14 15, 1530).

15 Further, although eye-witness Martinez never made a positive identification of Petitioner as
16 the knife attacker, when shown a picture of Petitioner, Martinez stated the picture was similar to the
17 person he had seen in facial characteristics, skin color, and weight.  (RT 773-75, 790-99, 1531-32).
18 At trial, Martinez testified that Petitioner's face, skin color, height and weight looked similar to the
19 knife attacker.  (RT 799-800).  Also, Martinez testified the knife attacker was wearing a white shirt
20 and dark pants on the day of the murder, which matched the description of what Petitioner had been
21 described as wearing that same day.  (RT 730, 751-52, 786-87, 1518-20).  Finally, Detective Brown
22 testified that the police searched for Petitioner for three months before arresting him, which could
23 have reasonably led the jury to infer Petitioner was hiding from the police, thereby demonstrating a
24 consciousness of guilt.  (RT 1531-32, 1559-67.)

25 Thus, contrary to Petitioner's assertion, in presenting the foregoing evidence, the prosecution
26 showed Petitioner was the knife attacker.  Furthermore, the absence of any evidence indicating
27 someone else had the motive or opportunity to assist Petitioner's brother in the attack adds further
28

---

[5] Although the Court of Appeal applied People v. Carter, 36 Cal.4th at 1156, the legal standard enunciated therein is the equivalent to the constitutional standard enunciated in Jackson v. Virginia, 443 U.S. at 324.

support. Consequently, a rational trier of fact, considering Petitioner's conduct and statements, as well as other circumstantial evidence, in a light most favorable to the judgment, could find the prosecution proved second degree murder beyond a reasonable doubt. Jackson, 443 U.S. at 324. Therefore, the state appellate court's decision there was sufficient evidence to support a rational trier of fact's conclusion Petitioner committed second degree murder is neither an unreasonable application of federal law nor an unreasonable determination of the facts. (Id.) Accordingly, the Court RECOMMENDS Ground Two of the Petition be **DENIED**.

**B.     Ground One, Three and Four: Improper Jury Instructions**

In Grounds One, Three, and Four, Petitioner contends the trial court misinstructed the jury on (I) aiding and abetting, (ii) reasonable doubt, and (iii) evaluating circumstantial evidence.

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Middleton v. McNeil, 541 U.S. 433, 437 (2004). "Nonetheless, not every ambiguity, inconsistency or deficiency in a jury instruction rises to the level of a due process violation." (Id.) Habeas relief can only be granted if "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Moreover, a single jury instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." (Id.)

When evaluating whether an ambiguous jury instruction rises to the level of constitutional error, the Court must determine whether "'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370 (1990)). If so, the Court must consider "whether the instruction, so understood, was unconstitutional as applied to the defendant." Calderon v. Coleman, 525 U.S. 141, 145 (1998). If a federal habeas court determines the trial court committed constitutional error in instructing the jury, it must consider whether the error was harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993) (the standard for determining whether habeas relief must be granted is whether the error had substantial and injurious effect or influence in determining the jury's verdict).

//
//

### 1. Ground One: Aiding and Abetting Instruction

In Ground One, Petitioner contends the trial court's instruction on aider-and-abettor liability, CALCRIM No. 401,[6] was confusing and misleading, in that the instruction provides it is not necessary that an aider be present at the crime. (Doc. 1 at 8-11.) Petitioner contends this portion of the instruction was inconsistent with the prosecution's theory of the case– that Petitioner was the second assailant who stabbed the victim after he was fatally shot– and thereby should have been redacted from the pattern instruction. (Id.)

Respondent contends the state court reasonably concluded the instruction on aiding and abetting did not mislead or confuse the jury. (Doc. 11 at 21-25.) Although the Court of Appeal criticized the trial court for not adopting the modification to the standard instruction proposed by defense counsel, Respondent contends the Court correctly concluded the jury was properly instructed on the law and was not likely to apply this law so as to convict Petitioner on an improper factual theory. (Id.)

The United States Supreme Court recently confirmed that when a jury is instructed on multiple theories of guilt, one of which is improper, harmless error analysis still applies. Hedgpeth v. Pulido, ---U.S. ----, ---- - ----, 129 S.Ct. 530, 531-32, 172 L.Ed.2d 388 (2008). Thus, in habeas cases involving instructional error, a habeas petitioner is generally not entitled to habeas relief unless such error had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); see also Clark v. Brown, 450 F.3d 898, 905 (9th Cir.) ("A habeas petitioner must show that the alleged

---

[6] CALCRIM No. 401 holds: To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1 The perpetrator committed the crime; 2 The defendant knew that the perpetrator intended to commit the crime; 3 Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4 The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.
If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.
[If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.]

instructional error 'had substantial and injurious effect or influence in determining the jury's verdict.' ") (citing <u>Brecht</u>, 507 U.S. at 637), cert. denied, 549 U.S. 1027 (2006).

In the last reasoned state court decision, the Court of Appeal held the trial court erred in refusing to accept Petitioner's request to excise the portion of CALCRIM No. 401 which states presence is not required to establish a defendant as an aider and abettor. (Lodgment 6 at 17.) Nonetheless, the Court of Appeal held this error was harmless upon examining the entire record. (<u>Id.</u>) In conducting this examination, the Court of Appeal analyzed (1) defense counsel's request at the instructions conference to modify the aiding and abetting instruction, (2) counsels' arguments in closing argument and rebuttal, and (3) jury questions during deliberation. (<u>Id.</u> at 10-18.) Specifically, the Court held:

> There is no doubt the prosecutor's theory was that appellant was the second assailant and, thus, aided and abetted the murder. However, whether intended or not–and his insistence CALCRIM No. 401 not be modified suggests it was intended–, the prosecutor's argument offered a second theory, i.e., that appellant's words and actions, even if he was not the second assailant, were enough to convict him as an aider and abettor.
>
> The prosecutor reminded the jurors that pursuant to CALCRIM No. 373, while the evidence showed other persons at the house besides the shooter and stabber were involved in the murder, the jury was not to speculate about those other persons. Whatever the prosecutor's intent in so stating, the argument suggested the prosecutor's position that persons at appellant's house, whether present at the crime or not, were involved in the murder.
>
> While making his case that appellant was the second assailant in discussing the concept of aiding and abetting, the prosecutor also emphasized it was unnecessary appellant be present at the commission of the crime in order to be found guilty as an aider and abettor. The prosecutor offered an example of a bank robbery in which two [of] the four persons guilty of the crime were not present and in which one of the four took no physical part in the crime whatsoever.
>
> The clear import of the prosecutor's argument was that while he believed the evidence established appellant was the second assailant, the evidence was sufficient to convict him as aider and abettor even if he was not. The prosecutor had a reason for taking this position, given that the sole eyewitness was unable to identify appellant as the second assailant and because the victim, shortly before he was shot by Alfredo, told a neighbor that one of Diane's son[s] was going to get his buddies.
>
> We agree with appellant the evidence was insufficient to support conviction of appellant as an aider and abettor to murder if he was not the second assailant, he had knowledge Alfredo was going to murder Cardona or that he intended, promoted, advised encouraged, or instigated a murder. As we have noted, the trial court did not instruct concerning the natural and probable consequences doctrine.
>
> While the evidence showed appellant, his mother and Alfredo had a serious argument with Cardona shortly before the shooting and while it might be inferred appellant knew or guessed Alfredo was planning to take additional action against Cardona, it is mere speculation appellant advised, promoted, instigated or encouraged Cardona's murder.

>Under the circumstances of this case, the trial court should have accepted appellant's request the portion of CALCRIM No. 401 stating presence is not required to establish a defendant as an aider and abettor excised from the instruction. The error in failing to do so when combined with the prosecutor's argument allowed the presentation of a theory of culpability not sufficiently supported by the evidence.
>
>The error, however, was harmless.
>
>"Where the jury considers both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative indication that the jury relied on the invalid ground." (*People v. Marks* (2003) 31 Cal.4th 197, 233; *People v. Guiton* (1993) 4 Cal.4th 1116, 1127-1128, 1130.) In reviewing for an affirmative indication the jury relied on the invalid ground, we examine the entire record including the facts, instructions, arguments of counsel and any communications from or to the jury during deliberations. (*People v. Guiton, supra*, 4 Cal.4th at p. 1130.)
>
>It was clear that based on his presentation of evidence and argument to the jury, the prosecutor's core contention was appellant was the second assailant and, thus, given the other evidence, an aider and abettor in Cardona's murder. This was the sole theory to which the defense responded. Nothing in the jury's questions indicates it was not focusing on the theory appellant was the second assailant or that they found he was not the person who stabbed Cardona. There is no affirmative indication the jury relied on the invalid factual theory offered by the instructions and the prosecutor's argument. Any error in the manner the jury was instructed on aiding and abetting, therefore, was harmless.

(Lodgment 6 at 15-18.)

Here, Petitioner is unable to demonstrate the Court of Appeal's determination–that the trial court's erroneous instruction on aiding and abetting was harmless– was either an unreasonable application of federal law or an unreasonable determination of the facts. Specifically, Petitioner is unable to demonstrate the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict," as required under Brecht. 507 U.S. at 637-38; see also Hedgpeth, ---U.S. ----, ---- - ----, 129 S.Ct. at 531-32. First, a review of counsels' closing arguments indicates the principal theory espoused by the prosecution to convict Petitioner was that he was the second assailant who stabbed the victim. In his closing argument, the prosecutor stated the evidence showed Petitioner attacked the victim with a knife. (Lodgment 2, volume 10 at 1724.) Although the prosecutor reminded the jury that the defendant did not need to be present when the crime was committed to be liable as an aider and abettor, the prosecutor subsequently stated, "[Petitioner] was there. He was a perpetrator. He was involved. He was one of the two, the person that stabbed Mr. Cardona after he was shot." (Id. at 1728-29.) In addition, in her closing argument, defense counsel reiterated the prosecution's theory that the only question in the case was whether Petitioner was the person who stabbed the victim, stating, "the only aider and abettor to the shooting is the stabber."

(Id. at 1766, 1788.) Thus, despite instructing the jury that presence is not required to establish a defendant as an aider and abettor, counsels' arguments suggest Petitioner was the second assailant and therefore present at the crime.

Second, the jury's requests and questions during deliberation do not suggest they considered any theory of guilt other than Petitioner being the second assailant. The jurors asked to rehear the testimony of Martinez concerning his description of the knife attacker and the testimony of Jose Jr. and a police officer regarding who made the comment about watching the evening news. (Lodgment 1, volume 1 at 119.) Additionally, the jury asked the following questions: (1) whether aider liability applied to both degrees of murder and manslaughter; (2) whether an aider's knowledge of the perpetrator's intention was equivalent to premeditation; (3) whether the murder occurred at the time of the shooting or the time of death; and (4) whether participation in the events of the crime constituted aiding. (Id. at 121-127.) Thus, despite having been instructed that presence is not required to establish a defendant as an aider and abettor, the jury's requests and questions suggest they relied on the valid factual ground–that Petitioner was the second assailant– to convict Petitioner.

Therefore, contrary to Petitioner's assertion, the record does not support the contention that the jury relied on an invalid factual ground for conviction. Consequently, Petitioner is unable to demonstrate the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht. 507 U.S. at 637-38. Thus, the Court of Appeal's decision is neither an unreasonable application of federal law nor an unreasonable determination of the facts. (Id.) Accordingly, the Court RECOMMENDS Ground One of the Petition be **DENIED**.

**Ground Three: Reasonable Doubt Instruction**

In Ground Three, Petitioner contends the trial court improperly instructed the jury on reasonable doubt. (Doc. 1 at 15-18.) Petitioner contends California's pattern jury instructions on

reasonable doubt and presumption of innocence, CALCRIM Nos. 220[7] and 222[8], are defective because they prevent the jury from finding a reasonable doubt based on the lack of evidence. (Id.)

Respondent contends the Court of Appeal reasonably concluded the challenged instructions were constitutionally adequate. (Doc. 11 at 25-26.)

In the last reasoned state court decision, the Court of Appeal held CALCRIM 220 properly instructs the jury on the law regarding reasonable doubt. (Lodgment 6 at 23-26, citing Victor v. Nebraska, 511 U.S. 1, 5 (1994)). Specifically, the Court noted the plain language of the instruction tells the jury that unless the evidence proves the defendant guilty beyond a reasonable doubt, the jury must acquit. (Id. at 26.) Therefore, the Court stated the "only reasonable understanding of this language is that a lack of evidence could lead to reasonable doubt." (Id.) (quoting People v. Flores, 153 Cal. App. 4'h 1088, 1091-93) (2007). Accordingly, the Court of Appeal rejected Petitioner's

---

[7] CALCRIM 220 states:

"The fact that a criminal charge has been filed against the defendant[s] is not evidence that the charge is true. You must not be biased against the defendant[s] just because (he/she/they) (has/have) been arrested, charged with a crime, or brought to trial.
A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt [unless I specifically tell you otherwise].
Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant[s] guilty beyond a reasonable doubt, (he/she/they) (is/are) entitled to an acquittal and you must find (him/her/them) not guilty."

[8] CALCRIM 222 states:

"You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom [or during a jury view]. "Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.
Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.
During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose.
You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses.
[During the trial, you were told that the People and the defense agreed, or stipulated, to certain facts. This means that they both accept those facts as true. Because there is no dispute about those facts you must also accept them as true.]
The court reporter has made a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's record be read to you. You must accept the court reporter's record as accurate."

contention that CALCRIM 220 implies that lack of evidence does not suffice for acquittal. (Id. at 24-25.)

The Due Process Clause of the Fourteenth Amendment protects the accused in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." See in re Winship, 397 U.S. 358, 364 (1970). In reviewing a reasonable doubt instruction, the proper constitutional inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard." Victor, 511 U.S. at 6.

Here, Petitioner is unable to demonstrate the Court of Appeal's determination that CALCRIM 220 properly instructs the jury on reasonable doubt was either an unreasonable application of federal law or an unreasonable determination of the facts. Specifically, Petitioner is unable to demonstrate there is a reasonable likelihood the jury applied CALCRIM 220 in a manner that violates the constitution. Estelle, 502 U.S. at 72. As noted by the Court of Appeal, the jury was instructed pursuant to CALCRIM No. 220 that "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty" and pursuant to CALCRIM No. 222 that evidence is the sworn testimony of witnesses and exhibits admitted into evidence. (Lodgment 6 at 24). Based on the plain language of these instructions, and in accordance with the requirements of in re Winship, 397 U.S. at 364, if the evidence presented to the jury was insufficient to prove an element of a crime beyond a reasonable doubt, this lack of evidence would have required acquittal. Therefore, contrary to Petitioner's assertion, there is no reasonable likelihood CALCRIM 220 and 222 improperly precluded the jury from considering lack of evidence in its determination of reasonable doubt. See Estelle, 502 U.S. at 72. Accordingly, the Court RECOMMENDS Ground Three of the Petition be **DENIED**.

**Ground Four: Circumstantial Evidence Instruction**

In Ground Four, Petitioner contends the trial court improperly instructed the jury on how to evaluate the sufficiency of circumstantial evidence. (Doc. 1 at 19-21.) Petitioner contends the trial

1  court's modification of CALCRIM 225[9] was misleading because it did not instruct the jury that if the
2  circumstantial evidence supported a reasonable conclusion that Petitioner was not the second
3  assailant, then the jury was required to acquit. (Id.)

4  Respondent contends the Court of Appeal properly concluded the instruction given was
5  adequate. (Doc. 11 at 27.) Further, Respondent contends the essence of the instruction was
6  reinforced by both counsels' closing arguments. (Id.)

7  In the last reasoned state court decision, the Court of Appeal held the trial court should have
8  instructed the jury on circumstantial evidence using CALCRIM 224. (Lodgment 6 at 21-23.)
9  However, the Court held the modified instruction sufficiently instructed the jury that if the
10 circumstantial evidence allowed a reasonable conclusion favorable to the defense, it was to be
11 accepted by the jury. (Id.) Specifically, the Court of Appeal held:

> We are at a loss to understand how this problem arose. In all essential aspects, the prosecution's case was based on circumstantial evidence. CALCRIM No. 224 states the concept that if the circumstantial evidence reasonably supported a conclusion favorable to the defense, it must be accepted. CALCRIM No. 225 is inclusive and clearly applies to all factual issues in a case. The Bench Note to CALCRIM No. 224 states the instruction must be given sua sponte "if the prosecution relies on circumstantial evidence to establish *any element* of the case." (Italics added.) The note adds that if the intent is the only element proved by circumstantial evidence, then the court is not to give CALCRIM No. 224 but instead give CALCRIM No. 225.
>
> CALCRIM No. 225 instructs concerning the same concept as CALCRIM No. 224 but confines it to the elements of intent and mental state. The Bench Note could not be more clear. It states in part: "Give this instruction when the defendant's intent or mental state is the *only element* of the offense that rest substantially or entirely on circumstantial evidence. If other elements of the offense also rest substantially or entirely on circumstantial evidence, do not give this instruction. Give CALCRIM No. 224." (Italics added.)
>
> The proper instruction on circumstantial evidence in this case was CALCRIM No. 224. The trial court, however, eschewed that instruction and instead rewrote the less inclusive CALCRIM No. 225 to make it more inclusive. While this process was unnecessary, the instruction crafted by defense counsel and the trial court sufficiently, if ungrammatically, instructed that as to any fact if the circumstantial evidence allowed a reasonable conclusion favorable to the defense, it was to be accepted by the jury. This concept was repeated during both parties' arguments and formed the argumentative context in which the case was to be decided.

---

[9] Modified CALCRIM 225 combined CALCRIM 224 and 225. CALCRIM 224 is the general instruction on circumstantial evidence, which explains the concept that if circumstantial evidence supports conclusions of both guilty and innocence, the jury must accept the conclusion of innocence. CALCRIM 225 conveys the same concept as CALCRIM 224 but does so only with regard to mental elements. The trial court, with the help and approval of defense counsel, modified CALCRIM 225 in an attempt to make it applicable to the proof of both mental and nonmental elements. (Lodgment 6 at 18-19.) Specifically, the trial court modified CALCRIM 225 by adding the term "conduct" wherever that instruction referred to "intent or mental state." (Lodgment 1, volume 1 at 87.)

> In an instructional sense, the trial judge decided to walk down stairs on his hands. He reached the bottom but could have arrived there easier, safer, and quicker by making the trip on his feet.

(Lodgment 6 at 21-23.)

Here, Petitioner is unable to demonstrate the Court of Appeal's determination– that the modified version of CALCRIM 225 properly instructed the jury on the evaluation of circumstantial evidence–was either an unreasonable application of federal law or an unreasonable determination of the facts. Specifically, Petitioner is unable to demonstrate there is a reasonable likelihood the jury applied the modified version of CALCRIM 225 in a manner that violates the constitution. Estelle, 502 U.S. at 72. As noted by the Court of Appeal, albeit with unnecessary revisions, the jury was instructed pursuant to the modified version of CALCRIM No. 225 that if the circumstantial evidence allowed a reasonable conclusion favorable to the defense, it was to be accepted by the jury. (Lodgment 6 at 22.) CALCRIM 224, the instruction Petitioner contends should have been given, would have instructed the jury in precisely the same manner. Further, as discussed above, the court instructed the jury pursuant to CALCRIM 220, which clearly instructed the jury on the prosecution's burden of proof. See Estelle, 502 U.S. at 72 (a single jury instruction should not be judged in artificial isolation, but must be considered in the context of the instructions as a whole). Therefore, contrary to Petitioner's assertion, there is no reasonable likelihood modified CALCRIM 225 did not instruct the jury that if the circumstantial evidence supported a reasonable conclusion that Petitioner was not the second assailant, then the jury was required to acquit. See Estelle, 502 U.S. at 72. Accordingly, the Court RECOMMENDS Ground Four of the Petition be **DENIED**.

//
//
//
//
//
//
//
//

## V. CONCLUSION

After thorough review of the record in this case and based on the foregoing, the Court hereby RECOMMENDS the Petition be **DENIED.**

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1994). Any party may file written objections with the Court and serve a copy on all parties on or before **October 25, 2010.** The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **November 8, 2010.** *The parties are advised that no extensions of time will be granted for purposes of filing objections.* The parties are further advised that failure to file objections within the specified time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: September 23, 2010

LOUISA S PORTER
United States Magistrate Judge

cc: The Honorable M. James Lorenz
all parties